WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ervco, Inc., et al., | No. cv-04-0452-PHX-ROS |
| Plaintiff, | **ORDER** |
| vs. | |
| Texaco Refining and Marketing, Inc., | |
| Defendant. | |

Pending before the Court is Counterclaimant Equilon's Motion for Summary Judgment on its Counterclaim (Doc. 211).  For the reasons stated herein, Equilon's Motion shall be granted.

**BACKGROUND**

In December 1991, Daniel J. Ervin entered into a franchise relationship with Texaco Refining and Marketing Inc. ("Texaco") to lease and operate a Texaco-branded gas station in Phoenix, Arizona.  The parties regularly renewed the franchise agreement every third year.

In 1998, Texaco and Shell Oil Company combined their retail marketing and refining assets into a limited liability company called Equilon Enterprises.  As part of this venture, they assigned their franchise agreements to Equilon.  The franchise agreement, now between Ervin and Equilon, continued to be regularly renewed until December 2003.

On December 5, 2003, Equilon notified Ervin that it was not renewing his franchise because Equilon had decided to sell the property.  On December 11, 2003, Equilon offered

to sell the property to Ervin for $658,000.00, which Ervin rejected.  Pursuant to the non-renewal notice, Ervin was to vacate the property on March 6, 2004.  Ervin refused, and filed suit against Equilon and Texaco for breach of contract, tortious interference, and violation of the Petroleum Marketing Practices Act ("PMPA").

Equilon filed a counterclaim seeking, among other things, liquidated damages for Ervin's holdover tenancy.  The governing franchise agreement states in relevant part:

> In addition to Lessor's rights under Article 20(b), Lessor will be entitled to compensation, as liquidated damages and not as a penalty, in the amount of $300.00 per day from Lessee from the date of termination or nonrenewal of this Lease until the date of final removal of Lessee's property and restoration of the Premises by Lessor or Lessee, as the case may be.

Ervin asserts that, under this agreement, Equilon is entitled to liquidated damages in the amount of $300.00 per day from the date of non-renewal until Ervin vacated the premises.

The Court granted summary judgment on Ervin's claim but has not yet ruled on Equilon's counterclaims.  In its counterclaim, Equilon alleges that it has the right to recover liquidated damages in the amount of $300.00 per day for each day that Ervin remained on the property (in total, $130,309.30 for 309 days) after December 4, 2003.  In the alternative, Equilon asks that Ervin be required to pay rent for his holdover tenancy at the rate he was paying to rent the property initially.  Equilon also asks for payment for motor fuel delivered to Ervin, totaling $30,860.46, plus interest at the rate of 10% per annum.

In this Court's March 31, 2008 Order, it ruled: "Equilon's offer to sell the property to Ervin did not have to be bona fide in order for Equilon to seek liquidated damages under the governing contract.  See Boyers v. Texaco Refining & Mktg., Inc., 848 F.2d 809, 811 (8th Cir. 1988) (holding that franchisee was liable to franchisor for holdover tenancy under the property lease regardless of whether franchisor violated the PMPA)."  (Doc. 208).  At that time, the Court reserved judgment on "the merits of Equilon's claim for such damages."

**ANALYSIS**

A. Standard of Review

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In addition, the dispute must be genuine; that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party; "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Id. at 255.  Therefore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage.  Id.

In Arizona, whether a contractual stipulation constitutes liquidated damages or an unenforceable penalty "is a question of law for the court."  Pima Sav. & Loan Ass'n v. Rampello, 812 P.2d 1115, 1118 (Ariz. App. 1991).

### B. Choice of Law

"[F]ranchise agreements governed by the PMPA are interpreted according to state contract law."  Han v. Mobil Oil Corp., 73 F.3d 872, 876 (9th Cir. 1995).  Ervin entered into a franchise relationship to lease and operate a Texaco-branded gas station in Phoenix, Arizona.  Neither party contests that Arizona contract law should govern interpretation of the agreement.

## C. Liquidated Damages

Contractual provisions providing for liquidated damages are considered enforceable where they have a certain reasonable relationship to the harms caused.  They are unenforceable where they constitute merely "[p]unishment of a promisor for having broken his promise."  Pima Sav. & Loan, 812 P.2d at 1118.

> [A]n agreement made in advance of a breach is a penalty unless both of two conditions are met.  First, the amount fixed in the contract must be a reasonable forecast of just compensation for the harm that is caused by any breach.  Second, the harm that is caused by any breach must be one that is incapable or very difficult of accurate estimation.'

Id. (citing Larson-Hegstrom & Associates, Inc. v. Jeffries, 701 P.2d 587, 591 (Ariz. App. 1985).  The reasonableness of the amount fixed is determined against "the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss."  Id. (citing Restatement (Second) of Contracts § 356, cmt b (1981)).  Similarly, "[t]he difficulties of proof of loss are to be determined at the time the contract is made and not at the time of the breach."  Id.  "When liquidated damages are specified in a contract, the terms of the contract generally control."  Roscoe-Gill v. Newman, 937 P.2d 673, 675 (Ariz. App. 1996).

Equilon argues that the damages caused by breach were uncertain when the contract was made due to the uncertainty inherent in the real estate market.  It writes:

> Ervin's holdover could have lasted a day, a month, six months or a year, as in this case.  During the same period of time, the Arizona real estate market fluctuated up to record highs and then down, the red hot Phoenix real estate market in 2003, 2004 and 2005 cooled off significantly and the economy has slowed.  There was no way that Equilon could have predicted in 2000 what the state of the real estate market or economy would have been in these years or today.

The general uncertainty of the real estate market as justification for liquidated damages comports with Arizona case law.  In Pima, the court noted that "real property is not a liquid asset easily converted into cash.  Who knew how long it would take to dispose of it and what it would sell for in the marketplace?"  Pima Sav. & Loan, 812 P.2d at 1118; see also Larson-Hegstrom, 701 P.2d at 592 (stating that "[c]ompensation associated with real estate contracts is by its nature difficult to estimate since what is being compensated is the

- 4 -

1  presentation of a ready, willing and able buyer . . . .").  Therefore, it is reasonable to
2  conclude that, at the time the contract was made, Equilon could not have determined its
3  loss from a holdover tenancy with any precision.

4      Ervin does not argue that the amount of damages provided for by the contract is
5  punitive.  The liquidated damages amount of $300 per day is less than the daily rent Ervin
6  was contracted to pay for the property (which came to $339 per day).  Thus, the
7  liquidated damages provision meets both the incalculability and the reasonability criteria.

8      Ervin, however, argues that Equilon cannot collect liquidated damages because it
9  has not affirmatively proven that any loss actually occurred.  It cites a comment to the
10 Restatement (Second) of Contracts which states: "If, to take an extreme case, it is clear
11 that no loss at all has occurred, a provision fixing a substantial sum as damages is
12 unenforceable." § 356, cmt. b (1981).  They cite as well to Nohe v. Roblyn Dev. Corp.,
13 686 A.2d 383, 384 (N.J. Super. Ct. App. Div. 1997), which holds that, in New Jersey,
14 liquidated damages could not be recovered where there were no damages.

15     Arizona is (fortunately) not New Jersey.  Arizona courts have not adopted the
16 Restatement's position on this matter.  And, in fact, the very New Jersey case that Ervin
17 cites recognizes that "our Supreme Court's construction of the relevant *Restatement*
18 (Second) provisions, § 356(1) and § 374(2), does not accord with some other courts.  See,
19 e.g., Pima Sav. & Loan Ass'n v. Rampello, 812 P.2d 115 (Ariz. App. 1991)."  Nohe, 686
20 A.2d at 385.  In fact, Arizona precedent has implicitly contradicted the position that actual
21 damages must be shown.  In Pima, the court did not require proof of actual damages and
22 explicitly stated that "the question is whether the stipulated amount was . . . reasonable at
23 the time of the contract and not whether it was reasonable with the benefit of hindsight."
24 168 Ariz. at 1118.[1]

25

---

26     [1] Even were Ervin's formulation of the law to be accurate, there is evidence that
27 Equilon has, in fact, suffered difficult-to-quantify harm due to fluctuations in the real estate
market during the time period in question.  However, given the law as it stands, it is
28 unnecessary to make detailed findings to that effect.

1    Arizona courts have found that a lack of showing of damages can weigh on the

2  reasonableness determination when examining liquidated damages.  See, e.g., Marshall v.

3  Patzman, 306 P.2d 287, 289 (Ariz. 1957) (holding that the liquidated damages at issue

4  were unconcsionable because "[t]here isn't any showing that Patzman has suffered any

5  damage whatever as a result of the breach by Marshall.").  However, given their

6  relationship to the rent asked for and the risks of damage from an unauthorized holdover

7  tenancy, the liquidated damages provision at issue in this case remains reasonable.

8    Ervin also argues that Equilon is not entitled to liquidated damages because of its

9  failure to comply with the PMPA in its termination/nonrenewal – in particular, through

10  failing to provide "Ervin with a *bona fide* offer to purchase the property, [sic] before it is

11  entitled to liquidated damages."  "The PMPA is intended to protect gas station franchise

12  owners from arbitrary termination or nonrenewal of their franchises with large oil

13  corporations and gasoline distributors, and to remedy the disparity in bargaining power

14  between parties to gasoline franchise contracts."  BP W. Coast Prods. LLC v. May, 447

15  F.3d 658, 662 (9th Cir. 2006) (quoting DuFresne's Auto Serv., Inc. v. Shell Oil Co., 992

16  F.2d 920, 925 (9th Cir. 1993)).  To this end, a franchisor can decline to renew a franchise

17  agreement and decide to sell the subject property only if such determination is "made by

18  the franchisor in good faith and in the normal course of business.'" 15 U.S.C. §

19  2802(b)(3)(A)(i).  And, before selling the property, a franchisor must  make "a bona fide

20  offer to sell, transfer, or assign to the franchisee such franchisor's interest in such

21  premises."  15 U.S.C. § 2802(b)(3)(E)(iii)(I).

22    However, as noted above, this Court has already ruled on the issue of whether it

23  must find that a bona fide offer was given.  See Order, March 31, 2008 (Doc. 208).  Ervin

24  argues that it is not foreclosed by issue preclusion as that doctrine "forecloses litigation

25  only of those issues of fact or law that were necessarily decided by a valid and final

26  judgment between the parties, whether on the same or a different claim."  Segal v. Am.

27  Tel. & Tele. Co., Inc., 606 F.2d 842, 845 (9th Cir. 1979).  However, Ervin merely copies

28  his earlier briefs, rejected by the Court in its earlier order, and provides no basis for

1    reconsideration of the earlier decision.  Thus, the Court will not consider whether or not

2    there was a bona fide offer as a precondition to Equilon's claim for liquidated damages.

3        Ervin does not contest the substance of the contractual provision or the length of

4    the holdover.  Accordingly, Equilon is entitled to liquidated damages under the contract in

5    the amount of $130,309.30.

6                                    D. Delivered Motor Fuel

7        Equilon argues that Ervin must pay for four shipments of delivered motor fuel,

8    costing $2,685.73, $4,252.50, $10,565.31, and $13,356.92.  Ervin argues that all evidence

9    demonstrating this debt is unenforceable because "Equilon did not disclose any evidence

10   in support of its alleged amounts due for fuel deliveries until December 9, 2005, almost a

11   year after the close of discovery."  Ervin also argues that Matt Hampton, from whom

12   Equilon submitted an affidavit on this matter, is incompetent to testify as to the cost of

13   this unpaid fuel because (1) while Hampton states that he relies on personal review of

14   "Mr. Ervin's franchise agreements, EFT statements, fuel invoices and other relevant

15   documents relating to Mr. Ervin's franchise as part of [his] normal course of business

16   duties and activities," he does not state that "he has any personal knowledge of who

17   prepared the EFT statements on which he relied for his conclusions, or how they were

18   prepared," and (2) Equilon's Response to Ervin's Trial Memorandum on Issues Raised in

19   Counterclaim states the method of calculating damages differently than does Hampton,

20   demonstrating his lack of personal knowledge.

21       Equilon's disclosure was prompt.  Even leaving aside that Ervin has admitted the

22   fact of the unpaid-for deliveries and therefore had knowledge of them as the party

23   receiving delivery, Equilon disclosed its claim prior to the close of discovery on

24   December 15, 2004.  To its Application for Preliminary Injunction, filed March 15, 2004,

25   Equilon attached an affidavit from Hampton stating that Ervin "did not pay for product

26   delivered in February and March 2004." (Doc. 5.)  On June 1, 2004, they disclosed in

27   their Initial Disclosure Statement that "Mr. Hampton has information about . . . Mr.

28

                                          - 7 -

Ervin's failure to pay for gasoline deliveries made to him in February and March 2004."

This is sufficient to ground knowledge of the claim prior to the discovery cut-off.

On the question of admissibility, the Federal Rule of Evidence 803(6) provides an exception to the hearsay rule for

> [a] memorandum, report, record, or data compilation in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . .

This exception is not limited to records created by the business presenting them in court. The Ninth Circuit has held that "records a business receives from others are admissible under [FRE 803(6)] when those records are kept in the regular course of that business, relied upon by that business, and where that business has a substantial interest in the accuracy of the records."  MRT Constr. v. Hardrives, Inc., 158 F.3d 478, 483 (9th Cir. 1998).  Electronic Fund Transfer ("EFT") statements prepared or kept  by Equilon in the normal course of business as part of their financial records fall squarely within this exception.

Further, the Ninth Circuit has found that "[a] witness does not have to be the custodian of documents offered into evidence to establish Rule 803(6)'s foundational requirements."  United States v. Childs, 5 F.3d 1328, 1333 (9th Cir. 1993) (citing United States v. Ray, 930 F.2d 1368, 1370 (9th Cir. 1991); Bergen v. F/V St. Patrick, 816 F.2d 1345, 1353 (9th Cir. 1987).  "The phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system."  Ray, 930 F.2d at 1370.  As Equilon's Area Manager, responsible for overseeing Ervin's franchise, Hampton was responsible for acting "as the point of contact between Equilon and Mr. Ervin involving any issue of non-payment of rent, non-payment of delivered product, . . . and other issues relating to the parties' franchise relationship."  Declaration of W.M. Hampton, Ex. B, ¶ 3.  Hampton states that he "personally reviewed Mr. Ervin's franchise agreements, EFT statements, fuel invoices and other relevant documents . . . as part of

[his] normal course of business duties and activities." Id. at ¶ 4. He is qualified to testify as to records kept by Equilon concerning the fuel deliveries.

Finally, Ervin points to Equilon's Response to Ervin's Trial Memorandum on Issues Raised in Counterclaim. In that document, Equilon included a number of POS credits included in the damage calculation. Equilon offered "no explanation for why these credits/offsets should be ignored," they state, continuing "[u]nder the circumstances, it is obvious that Hampton merely recited what he was told to say and did not actually have personal knowledge of the facts." Equilon replies that Mr. Hampton's affidavit that the damages total $30,860.46 is deemed admitted as it was not specifically controverted with "specific admissible evidence or a controverting affidavit" as required by L.R. Civ. 56.1(b).

Alert readers will note that Ervin's Response and Ervin's Reply raise two separate issues for the Court to consider. First, is the question of whether this negates Hampton's credibility as a witness to testify about damages. The Court does not agree that it demonstrates he is "merely recit[ing] what he is told to say," or that the evidence is inadmissible as a result. Thus, as Ervin does not contest that the fuel went unpaid for, only that the evidence of that is inadmissible, they are liable for the amount of the unpaid fuel.

The second question is whether Hampton's statement of the damages or Equilon's initial disclosure statement – quoted in its Response to Ervin's Trial Memorandum on Issues Raised in Counterclaim (Doc. 206) – is the correct formulation of damages. While admissible evidence would indeed generally be required to contest Equilon's evidence of damages, parties are often bound by representations they make in litigation, at least where the other party reasonably relied upon the representation. Heckler v. Community Health Servs., 467 U.S. 51, 58 (1984). As the Initial Disclosure Statement was intended to give Ervin fair notice of the claim, such reliance may very well have existed. Before the Court, then, is admissible, uncontroverted evidence that the damages total an amount that

is contrary to the party's own earlier representations, a discrepancy that may be innocent but which goes entirely unexplained.

It is not yet clear what the real amount of damages totals or whether Ervin relied on Equilon's earlier accounting of them such that Equilon should be estopped from changing its position.  Additional briefing on the issue of damages is required.  Accordingly,

**IT IS ORDERED** Equilon's Motion is **GRANTED**.  Equilon is entitled to $130,309.30 in liquidated damages.  Equilon is also entitled to payment for delivered motor fuel, amount to be determined.

**IT IS FURTHER ORDERED** Equilon shall submit a thorough accounting of the amount owed to it for undelivered motor fuel, including any POS credits subtracted from the total no later than **February 23, 2009**.  Counterdefendants shall have **15 days** to file a response; Equilon, **10 days** to file a reply.

DATED this 20th day of January, 2009.

_____

Roslyn O. Silver
United States District Judge